**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Timothy McTighe, LLC,** | ) | **CASE NO. 1:20 CV 902** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Signature Life Sciences, LLC, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |


**INTRODUCTION**

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 46).

This is a breach of contract case.  For the reasons that follow, the motion is GRANTED.

**FACTS**

Plaintiff Timothy McTighe, LLC ("McTighe, LLC") brings this action against defendants

Signature Life Sciences, LLC ("Signature") and Signature Orthopaedics, Pty., Ltd. ("Signature

Australia") alleging breach of a redemption agreement.

Timothy McTighe ("McTighe") is the principal and owner of McTighe, LLC.  Dr.

1

Declan Brazil ("Brazil") is the CEO of Signature Australia, as well as its controlling member. Over the years, McTighe and Brazil have worked together on various orthopaedic projects, including patent development and collaboration on a number of articles, publications, and book chapters.  Both are well-versed in the development and manufacture of orthopaedic devices. Ultimately, the two became close friends, and Brazil stayed in McTighe's house on several occasions.

In 2007, McTighe formed Concept Design and Development, LLC ("CDD").  At the time of the events relative to this lawsuit, McTighe, LLC, through an assignment, owned 78% of CDD.  As a result of worked performed by Brazil for CDD, Brazil owned a small interest in CDD.  The CDD subscription agreement provides that the loss of McTighe's services could materially and adversely affect CDD.

CDD's purpose is to commercialize and develop intellectual property related to orthopaedic devices.  The main focus appears to be the development of technology related to the "TSI" hip system.  The TSI technology is only one component of a total hip replacement.  CDD derived its revenue from licensing agreements, as well as McTighe's consulting services.  To that end, CDD entered into non-exclusive licenses.  Only three such licenses can be issued by CDD.

On May 31, 2007, CDD and Omnilife Science ("Omni") entered into a license for the use of CDD's TSI technology.  Thereafter, on June 13, 2007, CDD entered into a similar license with Global Orthopaedic Technology ("Global").  Global manufactured a product that relied on the TSI technology.  In 2012, Global terminated its license agreement.  At that point, Global owed CDD $200,000.

2

In 2013, Signature Australia entered into a license agreement with CDD. Signature Australia also purchased Global's inventory. In 2014, the Australian Therapeutic Goods Administration notified Signature Australia that the product could not be sold in Australia due to safety and performance concerns. Brazil testified that Signature Australia was not aware of the clinical problems Global had with the TSI product when Signature Australia first entered into the licensing agreement with CDD. Signature Australia was unable to sell the product in Australia and, as a result, it became delinquent under its licensing agreement with CDD. In addition, the parties had entered into a consulting agreement, pursuant to which CDD agreed to provide consulting services to Signature Australia. Both agreements were in default and, by the end of 2016, Signature Australia owed CDD approximately $600,000.

Over the summer of 2016, the parties began discussing the possibility of a merger that would include a waiver of the outstanding amount owed by Signature Australia. To that end, there are three memoranda of understanding. On June 28, 2016, McTighe sent a memorandum to Brazil discussing "a Signature purchase program of CDD, LLC...." In the memorandum, McTighe identifies the Omni license, the Signature Australia license, and a "third TSI License available" as some of the assets of CDD. The values of these licenses are identified as $150,000 per year, $175,000 per year, and $300,000 per year, respectively. In addition, McTighe identifies ten patents held by CDD. McTighe indicates that he will have "dollar figures" for these patents available the following month. The "terms of discussion" included a total "purchase price" of $4.5 million.

McTighe circulated a second memorandum on July 15, 2016. This memorandum spells out in greater detail how the parties could effectuate the purchase of CDD by one of Brazil's

3

entities.  The memorandum decreases the value of the "third TSI license available" to a

"potential" of $200,000 per year.  The total "purchase price" remained at $4.5 million.  In

addition, McTighe identifies the "gross sale revenue" of the Omni license and the third potential

license.   It also identifies the "total gross revenue potential" for all license agreements.

A third memorandum circulated on July 27, 2016.  At this point, the proposed purchase

price increased to $5 million.[1]

In December of 2016, the parties executed the planned purchase of CDD.  They did so by

a "reverse triangle merger."  The Agreement and Plan of Merger ("Merger Agreement") is dated

December 1, 2016.  For purposes of effectuating the merger, two new entities were formed–

CDD Acquisition, LLC and Signature.  After the merger, CDD survived as an entity wholly

owned by Signature.  In exchange for its ownership interest in CDD, McTighe, LLC received

156 "shares" of ownership in Signature.  Other entities received significantly more "shares" in

Signature.  As such, McTighe, LLC, through its ownership of a minority of Signature "shares,"

no longer had a controlling ownership interest in CDD.

The relevant terms of the Merger Agreement are as follows:

### RECITALS

D.    CDD has more than ten global patents, with additional patents pending, and three
       TSI License Agreements ([Omni], [Signature Australia] and a third available for
       market).  CDD has been valued in excess of USD $5 million for purposes of the

---

[1]    Defendants rely on this Memorandum in their brief in opposition.
       The brief in opposition indicates that the Memorandum is Exhibit
       29 to McTighe's deposition.  But, the document attached to
       defendants' Appendix as Exhibit 29 is an invoice that references
       the soon-to-be circulated third Memorandum, but does not contain
       the Memorandum itself.  Regardless, it does not appear that
       plaintiff disputes this fact.

4

Merger transaction.

*** 

2.   **Background of Merger Transaction**.  Signature Australia...is in material payment default under two separate agreements with CDD: [the license agreement and the consulting agreement].... The Parties agree that such payment defaults were occasioned by unanticipated delays in Signature[2] becoming established in the United States market.  After discussions and mutually acceptable negotiations the Parties have agreed to enter into this Agreement in lieu of CDD's pursuing its default remedies under the CDD License Agreement and McTighe Consulting Agreement.

6.   **Effect of Merger on CDD License Agreement and McTighe Consulting Agreement.**  At the Effective Time, the CDD License Agreement and the McTighe Consulting Agreement shall be null and void, and any and all defaults thereunder shall be deemed to have been fully cured by the consummation of the Merger.

10.  **Representations and Warranties of CDD**.  CDD represents and warrants to Signature...that:

(h) <u>Disclosure</u>.  CDD has disclosed to Signature all facts material to the business, assets, operations, financial condition, and prospects of CDD.  There is no matter known to CDD not disclosed to Signature which may have, or is having, a material adverse impact on CDD.  The information contained in the Exhibits attached and to be attached to this Agreement and in all other documents delivered and to be delivered hereunder by CDD to Signature is and will be complete and accurate and no representation or warranty made or to be made herein or therein contains or will contain an untrue statement or omits or will admit to state a fact necessary to make the representations contained herein or therein not misleading.

The purpose of the transaction as a whole was to "sell" CDD to Signature.  Thus, on the

same day the Merger Agreement was dated and executed, McTighe, LLC, Signature, and

---

[2]   Although the Merger Agreement indicates that "Signature" had difficulty becoming established in the United States, the Court presumes there is a typographical error in the Merger Agreement in that Signature only became established at the time of the merger for the purposes of effectuating the merger.  It appears that the parties intended to mean that Signature Australia is the defaulting party.

5

Signature Australia entered into the Redemption Agreement.  Pursuant to the Redemption

Agreement, Signature agreed to "redeem," or "buy back," 146 of McTighe, LLC's "shares" in

Signature.  Signature Australia agreed to guarantee both the payment and timeliness of

Signature's payments to McTighe, LLC.  The relevant provisions of the Redemption Agreement

are as follows:

### RECITALS

C.  The Obligation of [Signature] to redeem the McTighe Units ["shares"] is guaranteed hereunder, as to timely payment and not merely to [sic] as to ultimate collectibility, by Signature Australia, and will be further secured by a pledge by [Signature] of all of the post-Merger issued and outstanding equity interests of CDD....

### AGREEMENT

1.  <u>Redemption</u>.  McTighe, LLC shall sell to Signature, and Signature shall redeem from McTighe, LLC, [146 units] ratably in increments 1.21667 Units per month over a 120-month period commencing January 2, 2017 for payments aggregating $3,650,000, in equal monthly installments of $30,416.67 each.

3.  <u>Pledge of CDD Units</u>.  To secure Signature's payment obligations...Signature shall deliver to McTighe, LLC a certificate representing all of the issued and outstanding CDD Units immediately following the Merger, together with a stock power executed in blank.  If Signature shall default in the payment of any redemption payment required hereunder, which default remains uncured, either by Signature or Signature Australia, for 90 calendar days, then in such event ownership of CDD will be automatically be [sic] transferred to and vested in McTighe, LLC or its nominee without the necessity of any demand for payment or cure, or notice of default.

4.  <u>Guaranty of Redemption Payments by Signature Australia</u>.  The obligation of Signature to redeem [McTighe, LLC's units] is guaranteed, as to timely payment and not merely to [sic] as to ultimate collectibility, by Signature Australia.  The transfer of ownership of CDD to McTighe LLC pursuant to Section 4 shall not be deemed an election of remedies and shall not release Signature Australia from its guaranty.

22.  <u>Miscellaneous</u>.  This Agreement is the result of a full and complete negotiation at arms length by all parties.

6

Signature made 36 redemption payments for a total of approximately $1.1 million.[3] Signature made no redemption payments after December of 2019.

Thereafter, McTighe, LLC filed this lawsuit.  The First Amended Complaint contains three claims for relief.  Count one is a claim for breach of contract against Signature.  Count two is a claim for Enforcement of Guarantee against Signature Australia.  Count three seeks a declaratory judgment that ownership of CDD has reverted back to McTighe, LLC and that all redemption payments have been accelerated.  In response, Signature filed a counterclaim containing two claims for relief.  Count one is a claim for fraudulent inducement and count two alleges unjust enrichment.  Signature Australia filed a separate counterclaim asserting the same two claims.

Plaintiff moves for summary judgment and defendants oppose the motion.

**STANDARD OF REVIEW**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

---

[3]     Defendants argue that Signature "has redeemed 36 of the McTighe [shares]...."  But, the testimony cited by defendants discloses that Signature made 36 monthly *payments*.  Because the Redemption Agreement provides that 1.21667 shares are redeemed per month, it appears that Signature redeemed slightly more than 48 "shares."

7

> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate

that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip*

*Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on

its pleading, but must "produce evidence that results in a conflict of material fact to be solved by

a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

    The evidence, all facts, and any inferences that may permissibly be drawn from the facts

must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs.,*

*Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

    Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely

colorable" and not "significantly probative," the court may decide the legal issue and grant

summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## DISCUSSION

A.  The complaint

1.     Breach of contract

Plaintiff points out, and defendants do not dispute, that defendants have not made the required payments under the Redemption Agreement.  The sole argument raised by defendants is that the Redemption Agreement and the Merger Agreement are voidable as a result of fraudulent inducement.

To prevail on a claim of fraud in the inducement, a plaintiff must establish the elements of fraud by clear and convincing evidence:

> a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Tesar Indus. Contractors, Inc. v. Republic Steel*, 113 N.E.3d 1126, 1141 (Oh. Ct. App. 9th Dist. 2018).

Defendants point to the following misrepresentations in support of their claim.

a.  The Value of CDD

Defendants argue that McTighe misrepresented the value of CDD.  The Merger Agreement provides that "CDD has been valued in excess of USD $5 million for purposes of the Merger transaction."  According to defendants, no independent valuation or audit was ever conducted.  Defendants point out that CDD had gross receipts of $75,606 and $108,244 in 2015 and 2016, respectively.  In addition, defendants point out that McTighe testified that if he were not involved in CDD, then CDD would be worthless.  Defendants also rely on the testimony of their expert witness, who opined that at the time of the merger CDD had a value of between $1.67 million and $2.627 million.

9

Upon review, the Court finds that the "valuation" of CDD cannot form the basis of a fraudulent inducement defense.  McTighe testified that he did not obtain an outside valuation of CDD.  Rather, as seller, he valued the company at what he believed it to be worth.  In other words, he would not agree to sell CDD for less than $5 million.  Nowhere does the  Merger Agreement provide that CCD has been valued *by an outside source*.  Therefore, defendants fail to point to a misstatement or concealment of a fact.

Moreover, Brazil testified that he understood that the valuations in the merger memoranda–which led to the Merger Agreement–were based on McTighe's *opinion*. Specifically, Brazil testified as to the first memoranda as follows:

> Q:    Okay.  So did you ask [McTighe] about how he got to the valuation, in this iteration the total purchase price is $4.5 million, do you see that?
>
> A:    Yes.
>
> Q:    Did you ever have conversations with [McTighe] saying, [McTighe], how did you get there?
>
> A:    He would always answer that that is what it is valued at.
>
> Q:    My question is: Did you have conversations with him about how he arrived at this, after you received this document.
>
> A:    We would have– I would have asked him where did he get the valuation from, and he would have said that's the valuation in his opinion.
>
> Q:    Okay.  So that's the valuation in his opinion, and as a willing seller, he is willing to sell you these assets for 4.5 million dollars, right?
>
> A:    Mm-hmm.

(Brazil Dep. at 121-22).

Based on Brazil's own testimony, it is apparent that the valuation contained in the pre-

merger memoranda and, thus, the Merger Agreement[4] was based on McTighe's opinion as to the value of CDD.  A fraudulent inducement defense, however, requires reliance on a misstatement or omission of a material *fact*.  Therefore, fraudulent inducement cannot be based on the "valuation" of CDD since the parties understood it to be McTighe's *opinion*.

        b. License agreements

Defendants argue that plaintiff misrepresented the "state and prospects" for the CDD license agreements.  Defendants make three arguments in this regard.  First, defendants argue that plaintiff knew or should have known that Omni was going to stop making payments and terminate its license with CDD.  The argument is rejected. The parties signed the Merger Agreement in December of 2016.  Omni continued to make payments pursuant to the license through June 30, 2018– well after the consummation of the merger.  Defendants point to no evidence that McTighe knew or should have known that Omni planned to terminate its license agreement with CDD.

Defendants next argue that McTighe misrepresented the prospects of a third CDD licensee.  In the July 15 Memorandum, McTighe identified a "Third license available Potential (Value $200,000 per year)."  Defendants cite to the deposition testimony of McTighe, who

---

[4]    Defendants discuss the merger memoranda and the Merger Agreement collectively.  Thus, the fact that Brazil did not expressly testify regarding the phrase "has been valued at $5 million" is of little moment since it is clear that Brazil understood that the valuation of CDD was based on McTighe's personal opinion of the worth of the entity.  In addition, defendants offer the opinion of their expert witness, who opines that "perhaps" Signature relied on this statement as a basis for the transaction. But, defendants cannot create a question of fact with their expert in the face of Brazil's testimony that he knew the value was based on McTighe's *opinion*.

indicated that CDD was not actively pursuing any prospects for potential licensees.   Upon

review, the Court finds that this statement cannot be the basis for a fraudulent inducement

defense.  On its face, the statement provides that a third license is *available*.  Defendants point to

nothing untrue about this statement.  Plaintiff's own testimony confirms this conclusion:

> Q: And [McTighe] is not misrepresenting anywhere what the assets are, is he?

> A: No, other than the third license, which is, I guess not a misrepresentation.

Moreover, as with the overall purchase price, Brazil testified that the valuation of that

license was based on McTighe's opinion:

> Q: Okay.  We will get to Omni.  We will clear that up.  So we look at the draft terms and
> the purchase price.  Well, actually, so [McTighe], I guess you guys were having some
> conversations, he is saying the potential value now is $200,000 for the license, right,
> [McTighe's] opinion?

> A: Yeah.  That's his opinion for a third license, yeah.

Based on the foregoing, defendants understood that there was no paying licensee with

respect to the third license and that the valuation of that potential licensee was based on

McTighe's opinion.[5]  Because defendants point to no misrepresentation of fact or omission, a

fraudulent inducement defense will not lie.

> c.  Sales figures and clinical performance

The same holds true with regard to the alleged misrepresentation regarding the sales

figures for TSI.   Defendants argue that the sales figures in the July 15 Memorandum overstate

royalties.  According to defendants, the document is over-inclusive because it is not limited to

---

[5]      The Court further points out that Signature Australia itself was a
licensee with CDD for the same TSI technology.  As such,
defendants surely had some understanding of the value of revenue
from a potential third licensee.

the TSI portion of gross revenue.  Instead, it identifies gross sales revenue for the entire hip

replacement system, of which the TSI component is relatively small.

The Court finds that a fraudulent misrepresentation defense is not available with respect

to any alleged misrepresentation involving the gross sales data in the July 15 Memorandum

because there is no question that defendants did not rely on any such misstatement.  Brazil

testified that he disagreed with the manner in which McTighe based the royalty figures and that

the parties had a conversation about this very issue prior to the signing of the Merger Agreement:

> Q:    Did you ask him via writing or on the telephone?  How did you ask him?
>
> A:    It would have been on the telephone.  We spoke probably every second or third
>        day.  We spoke a lot on the phone.
>
> Q:    And did he provide an answer to your satisfaction?
>
> A:    Well, he acknowledged it. I said, [McTighe], it is not for $4,000– he as actually
>        got it as $5,000 as the, as the sale price. $5,000 is not the sale price of a hip stem
>        and the –
>
> ***
>
> Q:    I'm sorry.  That's my mess up.  Please finish, Dr. Brazil.
>
> A:    No.  I made it clear to him that the average selling price of a hip construct is not
>        $5,000, and I also made it clear that it is unfair to say that the total value of
>        revenue is based off the construct price.  It should be just based off the stem price
>        as opposed to the construct price.
>
> Q:    Okay.  And you had this conversation with him before you entered into the
>        merger agreement, correct?
>
> A:    Yeah.
>
> Q:    So you knew.  So you didn't rely on this, what you think is misleading, the direct
>        sales revenue of 4100 stems at 20 million as something that you relied on to enter
>        into the merger agreement, correct?
>
> A:    Correct.

(Brazil Dep. 132-33).

Brazil expressly testified that he did not rely on these statements in entering into the Merger Agreement because he believed them to be inaccurate.  Accordingly, a fraudulent misrepresentation defense cannot be based on sales revenue statements contained in the July 15 Memorandum because defendants  cannot show reasonable reliance as a matter of law.

Nor does a question of fact exist as to whether defendants reasonably relied on statements regarding the clinical performance of TSI.  Brazil points to the following testimony in support of his claim:

> Q:     And did you think that these were important things to know prior to entering into the [Merger Agreement]?
>
> A:     Getting details of clinical outcome data is important.  It is the measure of success of a device.  But if it is not available, you can't, you can't get it.
>
> Q:     Did you ask Dr. McTighe or CDD for it?
>
> A:     I asked [McTighe], and all I got was the anecdotal sort of response that was typical of his emails, was that, yes, thousands have been implanted and they are all doing brilliant.

Defendants further point out that there is a high revision rate with the "device," which caused surgeons difficulty in implanting it.  Currently, no surgeons in the United States use the product and it has been banned in Australia.

Although offering this generalized testimony that clinical data is important, Brazil's specific testimony belies his claim.  With regard to the disclosure of clinical data, Brazil testified as follows:

> Q:     Did you ask [McTighe] for any clinical data related to the surgical outcomes related to his technology prior to entering into the [Merger and Redemption Agreements]?

14

A:     No.  It was not available.

Q:     My question was: Did you ask him?

A:     No, didn't ask him because I was aware that there was none available at the time.... So I knew about the features, knew about what CDD was doing.  But I knew there was no commercial outcome data at that point.

***

Q:     Okay.  Did you do any independent investigation or evaluation concerning the TSI technology that was conveyed to Signature pursuant to the terms of the [Merger and Redemption Agreements]?

A:     No, because the only evaluation you can do is look at outcome data, and in the absence of outcome data, you can't assess, you can't look into the future and predict whether it is going to be a clinical success or a clinical failure.

(Brazil Dep. 61-62, 64).

In addition to the aforementioned clinical data, "soft data" existed regarding the technology.   Brazil testified that he was aware of the soft data.  (Brazil Dep. 64-65).[6]

Although defendants argue that plaintiff failed to provide clinical data or that defendants reasonably relied on statements regarding clinical performance, Brazil's testimony belies these claims. Brazil testified that no clinical data existed at the time of the consummation of the Merger Agreement and the Redemption Agreement.  Thus, defendants cannot point to any misstatement of fact or omission upon which they reasonably relied in entering into these agreements.  As such, a fraudulent inducement defense is not available.

Nor can defendants base a fraudulent inducement defense on an alleged failure to

---

[6]      Defendants also point out that there was some "loosening" associated with "fitment" issues, which arose after the consummation of the Merger Agreement.  But, defendants fail to point to any evidence indicating that *plaintiff* was aware of any "loosening" issues.

15

disclose problems with the TSI technology in Australia.  Defendants claim that they were not aware of Global's clinical problems before Signature Australia entered into the *licensing* agreement.  (Brazil Dep. 96-97).  As an initial matter, defendants do not point to any evidence demonstrating that plaintiff knew or should have known of the problems in Australia. Regardless, the voidability of the *licensing* agreement between CDD and Signature Australia is not before this Court.  It is undisputed that defendants knew of the problems with the technology in Australia before entering into the Merger Agreement and the Redemption Agreement.  (Brazil Dep. 97-98).  As such, there can be no fraudulent misrepresentation.[7]

    d.  Arms-length transaction

  Defendants point out that McTighe and Brazil had a very close personal relationship.  In addition, the two worked together over a number of years and Brazil placed a lot of trust in McTighe.  Signature Australia further owed plaintiff a significant sum of money after defaulting under its license agreement and consulting agreement with CDD.  Therefore, defendants lacked equal bargaining power in the transactions at issue.  Defendants also point out that they believed that the attorney representing CDD also represented defendants in the transaction, as that attorney had performed work on behalf of Brazil's entities in the past.  According to defendants, McTighe dictated all of the terms and defendants had no choice but to consummate the transaction.

  Plaintiff argues at length that these facts do not create a fiduciary duty as a matter of law.

---

[7]  Although defendants generically argue that plaintiff misrepresented the "extent of CDD's rights to various patents...and..intellectual property," no specific argument is presented beyond those addressed in this Opinion.

16

In response, defendants argue that they are not claiming that a fiduciary duty existed.  Rather, the facts demonstrate that the transaction was not "at arms length."  According to plaintiff, they need not establish the existence of a fiduciary duty in order to demonstrate fraudulent inducement.

Upon review, defendants concede that they are not alleging the existence of a fiduciary relationship.  *See*, Doc. 55 at PageID 1495 ("Plaintiff's fiduciary duty argument is therefore a red-herring that is inapplicable to Defendant's counterclaims for fraudulent inducement.").  Defendants, however, offer no legal context for their argument that the transaction was allegedly not at "arms length."  They do not explain how a fraudulent inducement analysis would change if the transaction did not occur at arms-length.   The Court notes that the existence of an arms-length relationship typically implicates whether a duty of *disclosure* exists.  *See Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988).  In *Blon*, the Ohio Supreme Court held that in a business relationship conducted at arms-length, there is no duty to disclose where each party is able to ascertain the relevant facts.  There is a duty to disclose, however, if the parties to the business transaction are in a "fiduciary relationship," where both parties understand that a special trust or confidence has been reposed, or where necessary to correct a misleading impression.  *Id*.

To the extent defendants rely on a *Blon*-type theory in arguing that no arms-length transaction occurred, the argument is rejected.  Defendants expressly disavow the existence of a fiduciary duty.  Defendants do not argue that both parties understood that a "special trust or confidence" existed.  Although Brazil and McTighe had a personal friendship, the Merger Agreement and the Redemption Agreement were entered into by two business entities.  Brazil had extensive experience in the industry and, specifically, with TSI technology.  Defendants

17

argue that Brazil did not have equal bargaining power because Signature Australia owed plaintiff $600,000.  But, the fact that one party owes another money does not, standing alone, create a position of trust or confidence.  Moreover, Brazil expressly testified that he did not have to enter in the agreements, but assumes he could have "walked away" from the license agreement and the consulting agreement and assessed the exit strategies under those documents.   (Brazil Dep. 120-21).

Further, as set forth herein, defendants point to no omission on which they reasonably relied in entering into the Merger Agreement or the Redemption Agreement that would have required correction.

e. Disclosure requirements

Defendants argue that plaintiff violated Paragraph 10(h) of the Merger Agreement, pursuant to which CDD represented that it had disclosed all "facts material to the business, assets, operations, financial condition, and prospects of CDD.  There is no matter known to CDD not disclosed to Signature which may have, or is having, a material adverse impact on CDD."

Defendants argue that CDD did not disclose basic financial documents concerning CDD. McTighe testified that he provided defendants with patent applications, patents, copies of the license agreements, memoranda, and member reports.  McTighe further testified, however, that he did not provide bank statements, financial statements, marketing projections, and third-party valuations of both CDD as a whole and of its intellectual property.  Defendants also argue that CDD never provided clinical data.  According to defendants, these "non-disclosures" and "concealments" constitute "breaches" of the Merger Agreement.  These breaches, coupled with the aforementioned alleged misrepresentations, create a genuine issue of material fact as to

18

whether the Merger Agreement and the Redemption Agreement are voidable.

Upon review, the Court disagrees.  As set forth above, there is no dispute that third-party valuations of CDD and its intellectual property do not exist.  Therefore, there could be no violation of the disclosure provision.  The same holds true with respect to clinical data.   Nor do defendants offer any testimony demonstrating that bank statements, financial statements, or marketing projections existed.  Even assuming some financial documents existed,[8] there is no argument or analysis regarding those documents.  Defendants fail to point to any evidence from which a reasonable juror could conclude that any such documents were "material" to the financial condition of CDD.  Nor do defendants point to any particular document that should have been disclosed, the disclosure of which would have been material to defendants' decision to enter into the Merger Agreement and the Redemption Agreement.

Upon review of the evidence and arguments as a whole, the Court finds that there is no genuine issue of material fact with regard to fraudulent inducement.  Therefore, no basis exists on which to void the Merger Agreement and the Redemption Agreement.  Because it is undisputed that Signature did not make the required payments under the Redemption Agreement, plaintiff is entitled to summary judgment against Signature on count one (breach of contract).

2.      Guaranty

Plaintiff moves for summary judgment on count two, which seeks to enforce Signature Australia's obligation to guarantee the payments under the Redemption Agreement.  The parties agreed that "[t]he obligation of Signature to redeem [McTighe, LLC's units] is guaranteed, as to

---

[8]      The Court notes that tax records for the years 2015 and 2016 exist.
It is not clear when those documents became available.

19

timely payment and not merely to [sic] as to ultimate collectibility, by Signature Australia....”
(Redemption Agreement par. 4).  Defendants make no arguments–other than those addressed
above– with respect to count two.  Therefore, for the same reasons, the Redemption Agreement
is not voidable and will be enforced.  Accordingly, plaintiff is entitled to summary judgment on
count two.

> 3.  Declaratory judgment

In this count, plaintiff seeks a declaration that ownership and control of CDD is vested in
McTighe, LLC and that the redemption payments have been accelerated.

Paragraph Three of the Redemption Agreement provides as follows:

> If [Signature] shall default in the payment of any redemption payment required
> hereunder, which default remains uncured, either by [Signature] or Signature Australia,
> for 90 calendar days, then in such event ownership of CDD will be automatically be [sic]
> transferred to and vested in McTighe LLC or its nominee without the necessity of any
> demand for payment or cure, or notice of default.

In addition, Paragraph Eight provides that in the event of a change in control of CDD, the
redemption obligation shall be accelerated.

Defendants argue that declaratory relief is not appropriate because there are genuine
issues of material fact as to whether the Redemption Agreement is voidable due to fraud.  The
Court rejected this argument above.  Defendants further argue that the testimony establishes that
plaintiff never ceded control of CDD to Signature, as required by the agreements.  Rather, Brazil
testified that, after the merger occurred, McTighe continued to run CDD.  Brazil did not have
access to CDD’s bank accounts or its tax filings. There was never a “hand over” of keys and
there was no notification to anyone that Brazil was CDD’s new president.  Accordingly, there
was no “change in control,” for purposes of determining whether to accelerate the redemption

payments.  Plaintiff responds by arguing that "the issue is not relevant to Plaintiff's Motion and will not be addressed...."

Upon review, the Court finds that plaintiff is entitled to a declaration that ownership of CDD is vested in McTighe, LLC.  There is no dispute that Signature is in default of the redemption payments and that 90 calendar days have passed without cure by either Signature or Signature Australia.  Having rejected defendants' fraudulent inducement arguments, Paragraph Three provides for this transfer of ownership.[9]

Although the argument is unopposed, the Court nonetheless rejects defendants' arguments regarding acceleration.  The provision provides that "in the event of a sale of 51% or greater in value of the assets, or a change in control of...CDD, the redemption obligation will be accelerated."  Here, Brazil does not dispute that Signature maintained *legal* control of CDD after the merger.   McTighe owned only a minority interest in Signature.  Pursuant to Signature's operating agreement, Brazil possessed the controlling vote with regard to Signature.  Brazil was the president of Signature.  Thus, Brazil controlled CDD.  The fact that Brazil did not exercise that control–either directly or by taking legal action on behalf of CDD–does not alter the fact that he possessed such control.  As such, when McTighe obtained control over CDD pursuant to Paragraph Three of the Redemption Agreement, Paragraph Eight's acceleration provision was

_____

[9]     Although not set forth by the parties, the Court presumes that Signature as an entity owned any and all outstanding interest in CDD.  Therefore, any other owners (including the pre-merger owners in CDD) retain their equity interest in Signature.  Signature, however, will no longer have any interest in CDD.  Although it is not clear whether Signature owns any other assets, as a legal matter, the ownership structure is such that the Redemption Agreement did not require Signature to directly transfer other owners' interest in CDD.

21

also triggered.

The Court acknowledges the apparent unfairness of this outcome.  McTighe will obtain ownership of CDD *and* defendants will be forced to make all of the required redemption payments, such that plaintiff gets to "have its cake and eat it too.[10]"  But, this Court cannot rewrite the terms of an unambiguous contract even if it seems one-sided.  *See*, *Ullmann v. May* , 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus* ("Courts do not relieve a party competent to contract from improvident agreement in absence of fraud or bad faith.").

B.  The Counterclaim

1.      Fraudulent inducement

Plaintiff moves for summary judgment on defendants' counterclaim for fraudulent inducement.  The parties make the same arguments set forth above in connection with defendants' fraudulent inducement defense.  Based on the same analysis, the Court finds that plaintiff is entitled to summary judgment on defendants' counterclaim for fraudulent inducement.

2.      Unjust enrichment

Plaintiff moves for summary judgment on defendants' unjust enrichment claim on the basis that a valid and enforceable contract bars an unjust enrichment claim covering the same

---

[10]      The Redemption Agreement specifically provides that "[t]he transfer of ownership of CDD to McTighe LLC pursuant to Section 4 shall not be deemed an election of remedies and shall not release Signature Australia from its guaranty."  (Redemption Agreement par. 4). It is apparent from a reading of that document that the reference to "Section 4," is a typographical error and that the reference should have been to "Section 3."  Notably, defendants do not argue that the provision is ambiguous.

subject matter.  In response, defendants argue that the doctrine is in applicable in instances where the underlying contract is voidable based on fraud.  Having determined that defendants cannot establish a claim or defense for fraudulent inducement, the agreements are not voidable.  Plaintiff correctly notes that the existence of a valid contract covering the same subject matter bars an unjust enrichment claim.[11]  *Ullmann v. May* , 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus*; *see also Aultman Hospital Ass'n v. Community Mut. Ins. Co.*, 544 N.E.2d 920 (Ohio1989); *Kwikcolor Sand v. Fairmont Minerals, Ltd.*, 2011 WL 6775580 (Oh. Ct. App. Dec. 22, 2011).  Accordingly, plaintiff is entitled to summary judgment on defendants' unjust enrichment claim.

C. Damages

The Court finds that plaintiff is entitled to a declaratory judgment that plaintiff is entitled to the ownership interests in CDD and is in control of that entity.  Based on the aforementioned breach of contract and enforcement of the guaranty contained in the Redemption Agreement, the Court finds that plaintiff is entitled to an acceleration of the total amount due and payable under the Redemption Agreement.  Plaintiff also asks for the imposition of joint and several liability.  Defendants offer no evidence in opposition to the amount of damages and make no arguments

---

[11]     Defendants further argue that McTighe did not notify any other members of CDD about the Redemption Agreement and has not distributed any proceeds from the redemption payments to other CDD members.  The Court is at a loss as to how these facts would result in an unjust enrichment claim in favor of defendants.  Defendants were certainly aware of the Redemption Agreement, which required Signature to essentially "buy" plaintiff's interest in CDD over time.  It is unclear to the Court what legal theory would require plaintiff to distribute proceeds from its "sale" of its own CCD shares to other CDD members.

23

against the imposition of joint and several liability.  Brazil testified that Signature made only 36 of the 120 required payments.  The Redemption Agreement provides for monthly payments in the amount of $30,416.67.  Therefore, the total accelerated amount due and payable is $2,555,000.28 (84 remaining payments multiplied by $30,416.67).  Defendants are jointly and severally liable to plaintiff for this amount.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is GRANTED as set forth herein.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/30/21

24